# HIGH COURT OF ERRORS AND APPEALS

#### FOR THE

# STATE OF MISSISSIPPI.

---

## OCTOBER TERM, 1854.

| 28 | 13 |
|----|-----|
| 71 | 340 |

### JAMES SHIRLEY et al. vs. DAVID O. SHATTUCK et al.

A trustee cannot acquire an interest in the trust property, adverse to the interest of the *cestui que trust*, during the continuance of the trust; yet when the trust is at an end, and a new trust created, to which he is a party, it is competent for him to make new terms and stipulations, for his own security in undertaking the trust. *Held*, that the rights and relations of the parties in this case were fixed, and are to be governed by the new arrangement, by which S. was to have the entire control and management of the property conveyed, until the debt due W. was paid, as well as the expenses and services of S. in relation to the trust, discharging him from his liabilities incurred in the execution of the trust. The original trust was thus suspended until these things were done, and then only partially to be restored.

S. held the legal title to the property embraced in the arrangement with W., with all the rights and powers declared in the instrument executed by him, and S. is accountable for the execution of his trust only according to those terms.

The rule has been sanctioned both in England and in this State, to allow persons acting in a fiduciary capacity, all reasonable counsel fees, paid in prosecuting or defending suits for the estate, in the *bonâ fide* assertion or protection of its interests; and this rule is equally applicable to trustees. *Held*, that the sound and just rule is, that although compensation may be allowed

VOL. VI.                                2

to a trustee who performs such service for the estate in his hands as an attorney or solicitor, yet it should never be allowed unless it be clearly shown beyond a doubt, that the legal proceedings were undertaken and conducted in good faith, and with an eye single to the best interests of the estate, and were necessary to protect its rights.

It would be a very strong justification of such services, that they were rendered at the instance of the *cestui que trust.*

The reasonableness of the allowance to S. for his services is shown, and he certainly was entitled to an allowance for the amount his services were worth in transacting the business. *Held,* that there is no such gross negligence shown on the part of S. as trustee, as would charge him with wages paid to C., as overseer of the property conveyed in the deed in trust.

S. had a right to place the slaves, for the forthcoming of which he was bound, in the custody of the law, if he thought there was danger of their not being forthcoming to discharge his liability for them.

The power was expressly conferred by the trust upon S., the trustee, to dispose of the property for the payment of the expenses and debts he had incurred on account of the property held in trust. *Held,* that the sale of the slaves by S. to pay his claim, was valid, and they cannot be reached by the complainants, in the hands of parties who purchased them from S. for a valuable consideration.

The decree subjecting the slaves in S.'s hands to the payment of a judgment rendered against him, in one of the suits brought by him to recover possession of the slaves levied upon by the sheriff of the county of T., was properly rendered.

ON appeal from the northern district chancery court at Carrollton; Hon. Henry Dickinson, vice-chancellor.

The opinion of the court contains a sufficient statement of the facts of the case.

*Enloe,* for appellants.

1. The court below erred in not sustaining the demurrer to the cross-bill. See 2 Amer. Chancery R. 346; 1 Smith's Chancery Practice, 459, note B.

2. The court erred in ordering an account to be taken of the matters prayed for in the cross-bill, because there was no proof to sustain the same, and because no fact charged in the cross-bill, if true, could entitle the complainant to the relief sought.

It was ordering an account unauthorized by the pleadings or proof. 10 Peters, R. 177; 6 Johns. R. 543.

3. Shattuck, one of the trustees, could not transfer or en-

cumber the trust estate, with any liability to pay damages to Alford, without the concurrence of Caruthers, the other trustee.

Trustees have all equal power, interest, and authority, and cannot act separately as executors may. Fonbl. 436.

He could not transfer the trust property, because the title of the property was vested in both trustees, and one alone could not divest it. He could not transfer the trust property, because the deed of trust creating his interest, gave the beneficiaries the right of possession of the same, of which the subpurchasers had notice. Shattuck admits, in his answer, his fraudulent and tortious possession. He admits that he obtained possession of the same, by making oath that he was entitled to the possession of this property; upon which he obtained a writ of *habeas corpus*, under which he took possession of the property, and that the writ has never been returned. Mr. Barr's deposition shows, that only three days previous to the issuance of this writ, Shattuck told witness that he had no further control or management of this property. The facts presented show that, in law, he never had any right to the possession of the same. His avarice seems to have triumphed over all his sense of moral obligation, and to have impelled him, at the hazard of his eternal soul, to take possession of this property, by making a corporal oath that he was entitled to the possession of the same. But the property belonged chiefly to minors, and the law is well settled that where the *cestuis que trust* are infants, there is no means by which the trustee can become possessed of an interest in the trust property.

A subvendee of the vendee of an infant of personal property, even though a purchaser for a valuable consideration without notice, cannot hold the property as against the infant. See 5 Smedes & M. 216.

4. The interest of the complainants could not have been divested by any contract they could have made, even by the consent of the husband or father.

The consent of an infant or married woman to a contract which is a breach of trust, will not prejudice them. See Hill on Trustees, 57.

5. If the trust estate by the levy, verdict, and judgment on

the trial of the right of property was vested in Wilson, freed from the limitations and restrictions of the deed of trust, still the purchase of it by Shattuck, one of the trustees, and the payment for the same with the effects of the trust estate, revested it in the trustees, subject to all the limitations fixed on it by the original deed of trust.   11 Smedes & M. 78; 2 Iredell, Eq. R. 304.

6. After the trial of the right of property, Shattuck placed an inexperienced overseer in possession of the trust estate against the consent of the complainants, who had the right of possession of the property secured to them by the deed of trust. The testimony shows that this overseer, Cobb, while in possession of the same under Shattuck, damaged the property to the amount of two thousand dollars.

Shattuck is liable for all the damage done by him, or resulting from the insufficiency of the overseer.   Fonbl. 434.

It was a condition precedent to his title to commissions, that his services should have been faithfully performed.   If he was guilty of gross neglect or misconduct, he not only thereby became liable to the principal, for any damages which they thereby sustained, but he thereby forfeited all commissions. Story on Agency, § 331.   A trustee cannot be allowed compensation for counsel fees.   See 1 Johns. Ch. R. 37.   A trustee cannot be allowed compensation, but is allowed for daily wages. 1 Johns. Ch. R. 27.

*Shepherd,* for appellees.

This case comes before the court on an appeal from decree of vice-chancellor on exceptions to report of commissioner. Exceptions to the report are in the nature of a special demurrer; the party excepting must put his finger on the error; the part not so excepted to is admitted to be correct both as to principles and evidence on which it is founded.   *Wilkes and wife* v. *Rogers et al.* 6 Johns. Rep. 591; *Story* v. *Livingston,* 13 Peters, 366.   This court will only review the very point raised and decided by the court below.   *Doe* v. *Natchez Insurance Co.* 8 S. & M. 205.   The first, second, and third exceptions are taken on the same ground, because no allowance could be

made to the trustee for professional services. According to the rule, as above stated, it is only necessary to examine this cause of objection, there being no objection that the proof was insufficient. This objection is taken upon the rule long recognized in England, that the service of a trustee was honorary, and no allowance would be made. However firmly this rule may have been recognized in England, it is believed that it has no place in American law. There is but a single case recognizing it in the court of chancery of New York. This rule, in England, extended to sergeants, and barristers, and physicians, on the basis that their services were honorary. It stands opposed to the utilitarian spirit which characterizes the present organization of society. The rule now acted upon by all is, that the "laborer is worthy of his hire." There is no objection in principle or practice to allow a trustee commissions in connection with allowance for specific services. *Rathburn* v. *Cotton*, 15 Pick. 484. The highest rate allowed to others who perform like services should be allowed trustees. *Barrell* v. *Joy*, 10 Mass. 229. A trustee is entitled to commissions for risk and expense in the usual course of business; when taken out of that course a reasonable allowance for services should be made. *Miller* v. *Beverly*, 4 Hen. & Mun. 420.

The fourth exception was not well taken, because from the testimony of Shirley before the commissioner, it appears that it was necessary to raise money to pay the second instalment to Wilson; and Shattuck made the second trip to New Orleans to procure money for that purpose, which he obtained, and paid the debt at maturity.

The fifth and sixth exceptions were taken to the payment to A. Cobb, "because his services were of no value." On this point the testimony is conflicting. Zealot, the overseer of complainants, and S. D. Bell, both swift witnesses, condemn Cobb; another witness of plaintiff says he was pushing and industrious, but unskilful; on the contrary, J. Cobb, Col. Leflore, and J. Kings, say that he was a fair overseer. But apart from this, it became necessary to employ Cobb in order to obtain security on the bond to Wilson. The arrangement with

2*

Wilson would have failed if the security had not been obtained, and it is very plainly shown that it could be obtained only on the condition that Cobb should have possession to protect the sureties.   There is no evidence of that bad faith which would warrant the court to impose this charge on the trustee.

The seventh exception is not sustained; the record filed shows that complainants were taxed with the cost, and the receipts of the witnesses are filed.

The ninth exception refers to the sale made by the trustee to Cobb and Betts; the proceeds of these sales were credited in the account due the trustee, for which the trust estate was chargeable.   It is not objected that the negroes were sold for less than their value, but only that the trustee had no power to sell.   This trust estate was attacked on all sides by the creditors of Shirley, who succeeded in fixing encumbrances on it, in the discharge of which, and the effort which became necessary for its protection, liabilities were incurred beyond its means for payment.   The court of chancery would have directed the sale of so much of the estate as might be necessary to meet these charges.

If a trustee does that which the court would have directed, the act will be sustained; more especially would this be true where the objection is only to the power, and there is no pretence of injury or loss by the exercise of such power.   2 Story, Eq. 979.

But these negroes were part of those that had been recovered by Wilson.   Under our statute regulating the trial of an issue between the judgment creditor and a claimant of property, the final judgment has the same effect on the rights of parties to the issue, as such judgment would have if rendered in detinue. Hutch. Code, 913, Art. 8, p. 3.

The surrender of the slaves to Wilson, vested in him the title; such would be the effect in detinue.   The sale from Wilson to Shattuck provided that the title should be retained by Wilson until the last instalment was paid.

Mr. Justice HANDY delivered the opinion of the court.

This bill was filed in the district chancery court at Carrollton,

Shirley et al. *v.* Shattuck et al.

by the complainants as *cestuis que trust*, for an account of the acts of the defendant Shattuck, as trustee of certain slaves held by him for the benefit of the complainants.

The questions for adjudication here arise upon exceptions which appear to have been taken below to the report and account returned by the commissioner appointed for that purpose. These exceptions are not set out in the record, though they are referred to in the final decree; and we are left to decide upon them by the pleadings and proofs as applicable to the report, so far as we can understand them by that means, it being conceded by counsel on both sides that such exceptions were taken in behalf of the complainants, the disallowance of which is now presented by the appellants as grounds of error.

In order to a proper understanding of the objections to the report, it is necessary to look at the case as presented by the pleadings.

It appears, that in the year 1841 Samuel B. Marsh and Leigh Maddux & Co., conveyed to Shattuck and Caruthers, as trustees, certain slaves and other personalty, for the use and benefit of the minor children of James Shirley, who were to be permitted through their agents or guardians to remain in possession and receive the profits and avails of the property, except so much as should be necessary to pay Marsh and Maddux & Co. about $16,000, in stated instalments, to be paid by the trustees, after the payment of which and upon the arrival of the youngest child at majority, the trustees should make an equal division of the property and its avails among the children. Afterwards an execution against Shirley in favor of one Wilson was issued from Yazoo circuit court for a large amount, and levied on these slaves; Shattuck, at the instance of Shirley, claimed them as trustee under the statute for the trial of the right of property, and upon the trial in Yazoo circuit court at November term, 1842, the slaves were found subject to the execution. Shortly after this and in December, 1842, Shattuck delivered over to Wilson the slaves found liable to the execution, under an agreement and arrangement made between him, Shirley, and Wilson, by which Shattuck became bound to pay Wilson a

sum agreed on, in two instalments, the latter of which was to be due on 1st March, 1844. Wilson conveyed the slaves to Shattuck, who afterwards, in February, 1843, entered into an agreement in writing declaring that he made the purchase as trustee for the use and benefit of the wife and children of James Shirley, and that when he should have indemnified himself for his expenses and services, and be discharged from all liability on account of the property, he should convey it to himself and Caruthers, as trustees, according to the terms of the aforesaid deed in trust, but discharged of the claims of Marsh and Maddux & Co., Shattuck reserving the power to mortgage or sell the property in furtherance of the trust, if necessary, accounting for the same as trustee. Shattuck took possession of the slaves and had control of them until 1st January, 1845, by the acquiescence of Shirley.

The bill alleges that Shattuck paid off all the money due Wilson, before the 1st January, 1845, by the sale of five of the slaves, and the avails of the trust property, and that thereupon the residue of the property belonged to the *cestuis que trust;* but that instead of delivering it over, he has committed various breaches of trust, among which are, employing unnecessary and incompetent overseers at extravagant wages which he has paid; interfering with competent overseers employed by the complainants; wantonly taking the slaves from the plantation when they were engaged in cultivating the crop, by judicial process on false pretences, and placing them in the hands of the sheriff, to the great damage of the crop; appropriating several of the slaves to his own use on false pretences, and without authority selling others to parties who purchased with notice; and prays for an account of the trustees' acts, for hire of the slaves, for a rescission of the sales of those sold to third persons who are made parties, and for damages for gross breach of the trust, etc.

The answer of Shattuck admits the statements in regard to the original trust deed, the execution of Wilson, and the arrangement made with him as to the purchase of the slaves. It states that this was done by James Shirley's procurement; that sureties had to be given to Wilson for the forthcoming of

the slaves sold to Shattuck, which were to be redelivered in case of failure of Shattuck to pay the money to Wilson; that Shirley was expected to provide the sureties, but was unable to do so, and Shattuck had to obtain them, but was unable to do so, except upon a condition agreed upon, that some reliable person was to be placed in charge of the slaves as a sentinel to guard against their removal; that therefore Cobb, the alleged supernumerary overseer, was employed, without which the whole arrangement would have failed and all the slaves have been taken off by Wilson, and that this was by Shirley's acquiescence. The answer alleges that Shattuck was compelled to attend the trial in Yazoo, at Shirley's request, as an attorney, and at great trouble and inconvenience; that shortly after this, the slaves were again levied on under executions in Tallahatchie county, and Shirley applied to him to go there and institute proceedings to get them out of the sheriff's hands, promising to give him a negro worth $300 for his services. He went reluctantly, and it became necessary for him to institute three actions of replevin, and to furnish surety on the bonds, which he did with great difficulty and upon agreeing to indemnify the surety. Soon after this, in February, 1843, a large quantity of the cotton raised by the slaves and sent to New Orleans, was there attached by a creditor of Shirley, who applied to him to go there and get the cotton released and provide for $2,500, which had shortly to be paid on Wilson's debt, for which service Shirley offered him $1,000, which he refused. At great inconvenience, he undertook the business, but before doing so, he stated in writing to Shirley the terms upon which he would agree to have any further connection with his business, which were in substance that the entire control of the property should be given up to Shattuck for reasons stated, and Shirley and wife were to have no authority whatever over it except to ship the crops, and that in Shattuck's name, who was to have the management in every particular until all suits were ended and his liabilities for the estate entirely discharged; he was to keep an account of all his acts, attend to the suits in Tallahatchie and New Orleans, and "reserve a reasonable lawyer's fee for those he attended to in person;" the value of his trouble and services

to be left to him, and the property to be an indemnity in his hands for his trouble and expense. To this, Shirley and wife gave their written assent, and both papers are exhibited with the answer.

It is further stated that Shattuck went to New Orleans and attended to the suit, but it was decided against him, and he was compelled to obtain a loan there of $2,500, to pay Wilson's debt, which he did with great trouble and difficulty ; that on his return he received the negro promised him for his services in the suits in Tallahatchie, which he has kept since as his property, and has given credit for the value in his account; that he was then compelled to sell some of the slaves to pay the money borrowed in New Orleans; and in January, 1844, he went to New Orleans to sell the cotton on hand, and had to borrow $3,500 to pay the balance of the debt to Wilson ; that the estate being then largely indebted to him, he agreed with Shirley to take two of the slaves at $1,200, the price agreed on, for which he has given credit in his account. He admits that he paid Cobb's wages against the objections of Shirley, but was obliged to do so under his contract; and that Wilson's debt was paid by March, 1844, but that a debt remained due for money borrowed to make the payment. He admits that Shirley obtained possession of the property in January, 1845; but at that time a considerable amount was due Shattuck, and he was bound for the forthcoming of the slaves for which he had brought suits.

As to the removal of the slaves from the plantation in April, 1845, and the damage done the property, he alleges that he went to the place for the purpose of having a final settlement, and being discharged from all connection and responsibility on account of the trust. Failing in that, that he required the overseer in charge of the property to sign a written statement that he held the slaves as Shattuck's agent and subject to his control, to which Shirley objected, and the overseer refused; that he then sued out a writ and took the slaves, for the forthcoming of which he was bound, and delivered them to the sheriff; he also took nine other slaves, in virtue of his legal right to them, to satisfy the amount due him and to indemnify him for his

liabilities on account of the trust estate, and sold six of them to pay the amount due him, and retained three to indemnify him for his liabilities on account of the trust property. He admits that damage was done to the crop by the removal of these slaves, but insists that it was produced by Shirley's own fault; that he had a right to take and dispose of the slaves to pay the amount due him, and as to those for which he was bound, that he had a right to have them secured so that he would sustain no loss. He returns his account, showing receipts and disbursements, and his claim for services.

The vice-chancellor ordered an account to be taken, on the report of which he decreed that there was a balance due Shattuck of $1,434.76, on account of the trust, and that the trust property in his hands was subject to the payment of a judgment rendered against him on account of the trust; and that, unless these amounts should be paid by the complainants within a stated time, the slaves should be sold to pay the same; from which decree this appeal was taken.

The question which lies at the foundation of this controversy is, What relation did Shattuck bear to the trust property after the arrangement by which it was conveyed by Wilson to him; and what interest in, and power over it, had he by that arrangement, taken in connection with the original trust deed of Marsh and others?

It appears by the record, that in the trial of the suit of Wilson against Shattuck, in Yazoo circuit court, the original trust deed was held to be void as to Shirley's creditors, the slaves were condemned to pay Wilson's execution, and were surrendered to him in compliance with the judgment against them. This necessarily put an end to that trust, and no rights of the *cestuis que trust* can be asserted against Shattuck as trustee in virtue of it, unless new efficacy were given to it by acts subsequently done between the parties. This appears to have been fully recognized by them, insomuch that it was considered necessary to make a new arrangement for the wife and children of Shirley, and accordingly it was agreed that Wilson, to whom the slaves had been delivered in discharge of his judgment, should convey them to Shattuck for a stipulated

price to be paid by him, he being bound with surety to rede-liver the slaves to Wilson, in the event of failure to pay the sum agreed upon. It was also agreed that Shattuck held the slaves as trustee for the wife and children of Shirley, and that when he should be paid for his services and expenses, and dis-charged from all liability on account of the property, Shattuck and Caruthers were to hold it according to the terms of the original trust deed, for the benefit of Shirley's wife and children, exclusive of the creditors of Shirley, whose claims were secured by that deed, with power to Shattuck to mortgage or sell the property for the purposes of the trust. These terms were agreed on by James Shirley in behalf of the *cestuis que trust*, and declared in writing by Shattuck. No objection is made to the regularity and legal sufficiency of the arrangement. It was made between competent parties, Shirley acting for his wife and children, and to secure rights to them which otherwise would have been lost.

Although a trustee cannot acquire an interest in the trust property adverse to the interest of the *cestui que trust* during the continuance of the trust, yet when the trust is at an end, and a new trust created to which he is a party, it is competent for him to make new terms and stipulations for his own secu-rity in undertaking the trust. And it is too clear for contro-versy, that the rights and relations of the parties concerned were fixed and governed by the new arrangement, until its object should be accomplished, by paying the debt to Wilson, the expenses and services of Shattuck in relation to the trust, and discharging him from his liabilities incurred in the execu-tion of the trust. The original trust was superseded until these things were done, and then only partially to be restored.

There cannot, therefore, be a doubt that Shattuck held the legal title to the property embraced in the arrangement with Wilson, with all the rights and powers declared in the instru-ment executed by him, and is accountable for the execution of his trust only according to those terms.

The next subject for consideration, then, is, whether his acts as trustee, and the account taken in this case, are justified by the rights and powers held by him. In considering the matters

involved in this inquiry, it is necessary to remark that the testimony is exceedingly voluminous, and, in some respects, conflicting, the commissioners report .confused, and the particulars of exception taken to it not set out in the record. We can, therefore, notice only such principles upon which the decree appears to have been rendered, and such objections to the account, as appear by the record with sufficient distinctness to justify a consideration of them here.

The first exception to be noticed, is that taken to the allowance to Shattuck, of fees and compensation for attending to suits in relation to the trust property, as an attorney at law, in Yazoo and Tallahatchie circuit courts and in New Orleans.

It is insisted that the trustee was not entitled to allowance for such services, and this presents a question of much practical importance, which we will proceed to consider.

The general rule is well settled in England, that a trustee shall have no allowance for his care and trouble in the performance of his duties in relation to the trust, because thereby the trust estate might be loaded and rendered of little value. The trust is also there considered honorary, out of which the trustee is not permitted to make a profit. But these general principles have been much modified in England. It was said by Lord Cottenham in the recent case of *Craddock* v. *Piper*, 1 Hall & T. 617, recognizing the general principle, that there is no case in which it has been extended beyond the dealing of the trustee for himself and acting for himself in the execution of his trusts, and that he was entitled to compensation when he acts as solicitor in a suit for any of the *cestuis que trust*, or when he acts for himself and his co-trustees or *cestuis que trust* jointly. A solicitor, who is also a trustee and a defendant as such, is also held to be entitled to compensation from the *cestuis que trust*, as between solicitor and client. *York* v. *Brown*, 1 Coll. 260. Also, that the creator of the trust may provide generally for compensation to the trustee, or he may fix it specifically, and when the amount is not fixed, it will be referred to the master to be ascertained. *Ellison* v. *Airey*, 1 Ves. 115; *Willis* v. *Kibble*, 1 Beav. 559; *Jackson* v. *Hamilton*, 3 J. & L. 702. And it is held to be competent for trustees to contract

with the *cestuis que trust,* to receive compensation for acting, or to make professional charges.  *Bainbrigge* v. *Blair,* 8 Beav. 567.   Lord Hardwicke said in *Ayliffe* v. *Murray,* 2 Atk. 58, " if the trustee comes in a fair and open manner, and tells the *cestui que trust* that he will not act in such a troublesome and burdensome office unless the *cestui que trust* will give him a further compensation, over and above the terms of the trust, and it is contracted for between them, I will not say that this court will set it aside."

In the United States the strict English doctrine is very generally abandoned, and the rule generally prevails that the trustee is entitled to reasonable compensation for his services.   In most of the States, statutes have been passed allowing compensation to executors, administrators, and guardians, and the equity of these statutes has been held to apply to general trustees.   *Meacham* v. *Steans,* 9 Paige, 403 ; *Boyd* v. *Hawkins,* 2 Dev. Eq. 334 ; *Ringgold* v. *Ringgold,* 1 Harr. & Gill, 27 ; *Nichols* v. *Hodges,* 1 Peters, 565.

The rule has been sanctioned both in England and in this State, to allow persons acting in a fiduciary capacity, all reasonable counsel fees, paid in prosecuting or defending suits for the estate, in the *bonâ fide* assertion or protection of its interests.   *Macnamara* v. *Jones,* 2 Dick. 587 ; *Stanes* v. *Parker,* 9 Beav. 389 ; *Satterwhite* v. *Littlefield,* 13 S. & M. 306.

Is there any just reason why this rule should not be applied to trustees, who are also solicitors or attorneys, when it is manifestly for the interest of the estate, and in advancement of the trust, that suits should be brought by the trustee, or when he is sued and compelled to defend the rights of the estate, and performs that service himself, and with skill and fidelity, instead of employing other counsel?   We think not; for although it was the duty of the trustee to protect the interest intrusted to him, he was not compelled to go beyond the usual course required of any faithful and prudent man, and bestow his extraordinary labors, such as were appropriate to a particular professional class, to the business committed to him only as a private individual.   He must be presumed to have undertaken to perform the duties in the ordinary and necessary course in which a faithful private man would have been required to perform them,

and no further; for if more had been contemplated, it is not to be supposed that special provisions would not have been made for his compensation. But considering the temptations to improper conduct on the part of the trustee in performing such services himself, and the opportunities he has to impose upon the estate, it is certainly the safer course for the trustee to employ other counsel, especially as it is his duty to be vigilant and see that the counsel employed does his duty.

We think, therefore, that the sound and just rule is, that although compensation may be allowed to a trustee who performs such services for the estate in his hands as an attorney or solicitor, yet that it should never be allowed, unless it be shown clearly and beyond doubt, that the legal proceedings were undertaken and conducted in good faith, with an eye single to the best interests of the estate, and were necessary to protect its rights, and such as a discreet and judicious man would have instituted in a matter of his own individual interest. It would, of course, be a strong justification of such services, that they were rendered at the instance of the *cestui que trust.*

Applying these rules to the circumstances of this case, we think it a proper one for the allowance of compensation to the trustee, upon several grounds. In the first place, it is shown that the services were performed at the special instance of James Shirley, the agent of the *cestuis que trust* under the original trust deed, and who represented them throughout the business. Second. The instrument declaring the trust, clearly recognizes his right to compensation, and gives the right to hold the property until he was paid, and this is much strengthened by the subsequent agreement made. Third. It is shown that the services were out of the usual course of the trustee's duty, and were deemed by the agent of the *cestuis que trust*, indispensable to the interest of the trust estate, and were faithfully performed, in suits instituted without his procurement, and at the instance of the agent of the *cestuis que trust*, and manifestly for the benefit of the trust estate. Under such circumstances, we think that the trustee was entitled to an allowance for what his services were reasonably worth. The proof goes fully to establish the reasonableness of the allowance, and we

do not think that the exception on this ground was well taken. Nor is it any objection, that the claim on which the allowance was made, was set up in the defendants' cross-bill which was dismissed, and that, therefore, there was no ground for the allowance. The complainants' bill sought an account, and in taking it, it was proper to settle all the claims and rights of the parties growing out of the trust, and necessarily involved in its execution.

The next exception to be noticed is, that the trustee was allowed for the money paid one Cobb, who was placed in charge of the trust property, to guard it, at extravagant wages, when he was incompetent and his services unnecessary. It appears that it was part of the arrangement with Wilson, that bond with sureties for the forthcoming of the slaves in the event of failure to pay Wilson the purchase-money, was required to be given, and without it, that the property could not have been obtained for the complainants. It was found to be out of the power of Shattuck, who was acting for Shirley's wife and children, and at his instance, to give the sureties without placing some one to guard the property and prevent its removal, which it appears the sureties feared would be done. Hence, by the consent of parties, Cobb was employed, and his compensation was to be fixed by the sureties. It was afterwards fixed accordingly, and the allowance to the trustee was for the amount so paid, which included both his wages as a guard over the property and as overseer. We see nothing in this which should cause the loss of the wages thus paid to fall on the trustee. For the most part, the money was paid in consequence of the arrangement by which the property was secured to the *cestuis que trust,* and without which it would have been lost to them. It is true, the payment was objected to ; but the trustee had become bound for the wages, and he could not refuse to carry out his contract, made in furtherance of the arrangement for securing the property to the *cestuis que trust.*

It appears by the proofs, that Cobb was employed as an overseer, because the trustee was compelled by his contract to keep him on the place, and he considered it bad policy to employ an overseer in addition to him. The testimony in regard

to his competency as an overseer is conflicting, and we do not think that the circumstances of the case make out such a case of gross negligence as to charge the trustee with the loss of his wages, and the damages alleged to have been sustained by his bad management.

The complainants also excepted to the allowance for hire of the slaves received by Shattuck for what was due him. The slaves were taken by Shattuck as a payment on the debt due him on account of the trust. If hire should have been allowed at all, he was also entitled to interest on the debt due him. But no interest was allowed, and no hire should have been allowed. It was more proper to consider the value of the slaves as a credit on the claim of Shattuck at the time they were appropriated to his use; and in this view, no hire should have been allowed, and the appellants have no ground to object that too little was allowed for hire.

The next exception is, that no damage was allowed against the trustee for injury done to the trust property by his wanton and illegal removal of the slaves from the plantation in the spring of 1845, whereby the crop was largely injured, and a great loss occasioned to the complainants.

Although these acts may have been harsh, we can only consider whether Shattuck had the legal right to take the steps he did in regard to the property. It appears that the trust estate was in arrears to him in a considerable amount, and that it remained unsettled; that he was desirous of being discharged from his trust, and of having a final settlement of his accounts and connections with it; that he applied to James Shirley for that purpose, and they could not agree; that at that time, the trust property was under the control of Shirley, who had an overseer on the place and in charge of the hands; and Shattuck, fearing that his right of possession and control of the slaves, as trustee, might be jeoparded, applied to Shirley and the overseer to acknowledge his right of possession, and that they refused to do so. Some of the slaves were not subject to the trust in Shattuck's hands, but he had instituted an action of replevin for them, and given bond for their forthcoming. Fearing that they might be placed beyond reach of process, if

3* -

he was held liable for them, he obtained judicial process to have them placed in the custody of the law, which was done. The other slaves removed were taken, under the right which he had as holding the legal title, to pay him the amount due him on account of the trust, and as a security for liabilities incurred by him at the instance of the *cestuis que trust* through their agent, on account of the trust property.

As to the slaves for the forthcoming of which Shattuck was bound, he had the right to place them in the custody of the law, if he thought there was danger of their not being forthcoming to discharge his liability for them. And an opportunity was afforded the agent of the complainants to prevent their removal, which he declined to accept.

As to the slaves to which Shattuck held the legal title under the trust, it appears that there was a considerable balance due him on account of the trust, and that he was under liabilities for the trust property. We have above seen that on these accounts he had the right to hold the slaves and to dispose of them. The agent of the complainants refused to acquiesce in this right, and he thereupon took into possession such of the trust slaves as he deemed sufficient to satisfy his claim, and sold them for that purpose, retaining and holding three others in his hands as an indemnity for his liabilities for the trust property. For those sold, he is charged in the account stated, and the others he holds as an indemnity for his liabilities.

The exercise of this power by the trustee may have been rigorous. But it was a right expressly secured to him in the trust, and we cannot say that, under the circumstances appearing by the record, its exercise was such an abuse of the power as to entitle the complainants to damages for the injury sustained to the property.

It follows from this, that the sale of the slaves by Shattuck in payment of his claim was valid, and that they cannot be subjected to the claim of the complainants in the hands of the parties who have purchased them from him for a valuable consideration.

The only other question is, as to the propriety of the decree, subjecting the slaves in Shattuck's hands to the payment of a

judgment rendered against him in one of the suits brought by him to recover possession of the slaves levied upon by the sheriff of Tallahatchie county.

It is not questioned that this was a liability incurred by Shattuck on account of the trust property, and at the special instance of the *cestuis que trust* acting through their agent.

Under the terms of the declaration of trust, this was a liability for which the trust property was bound, and before the *cestuis que trust* could claim possession of the slaves from Shattuck, this liability was required to be discharged. It was, therefore, proper that this judgment against Shattuck should be paid before he should surrender the trust property; and upon failure to pay, that it shall be sold in satisfaction of the judgment.

Upon a careful review of the whole record, we think the decree was correct, and should be affirmed; which is accordingly done.

FISHER, J., having been counsel in the court below, took no part in the decision of this cause.